UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| ALLEN JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 21-240-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| KONECRANES, INC., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Allen Jackson suffered a workplace injury in early 2019 while working as a crane inspector for Defendant Konecranes, Inc.  He filed a workers' compensation claim, and doctors imposed various physical work restrictions relating to this workplace injury.  Jackson was terminated over a year later after a customer, Novelis Corporation, complained that he was not working sufficient hours at its facility in accordance with its contract with Konecranes. This action followed that termination.

Jackson alleges one claim of retaliation under the Kentucky Workers' Compensation Act ("KWCA"), and Konecranes has moved for summary judgment on that claim.  Having reviewed the record and the relevant authority, the Court agrees with the defendant that the plaintiff has failed to offer sufficient evidence that his workers' compensation claim caused his termination.  Summary judgment is appropriate on causation grounds.

## I.  Background

### A.  Jackson's Injury, Workers' Compensation Claim, and Initial Physical Work Restrictions

Konecranes "manufactures cranes and other heavy lifting equipment and is engaged in the business of providing crane and hoist maintenance, installation, inspection, repair, upgrading, modernization and similar services." [Record No. 26-2, ⁋ 3]  Its customers include Toyota Motor Manufacturing in Georgetown, Kentucky and Novelis in Berea, Kentucky.  [*Id.*]  Novelis "was the first Konecranes customer in Kentucky" and is considered a "long-time valued customer."  [*Id.* at ⁋ 4]

Jackson began working as a service technician for Konecranes in 2011 in the company's Huntington, West Virginia branch.  [Record No. 26-3, p. 10:10-21]  He became a certified crane inspector and transferred to Konecranes' Georgetown branch on August 15, 2016.  [*Id.* at pp. 12:4-16:7; Record No. 26-7]

On January 19, 2019, Jackson slipped on black ice while getting out of his company truck at Konecranes' Toyota worksite in Georgetown.  [*Id.* at pp. 15:17-22, 27:22-28:9; Record No. 26-25, p. 2]  Describing the fall during his deposition, Jackson specifically recalled: "I stepped out and I put all my weight on my first foot and I kind of slipped out of the car and I tried to catch myself and I twisted and jammed my right arm and bent my wrist back really bad.  I thought I was just stubbed up at the time." [Record no. 26-3, p. 28:4-9]  He reported this injury Konecranes' Toyota site manager John Justice, who "came over and wrote down everything that happened."  [*Id.* at p. 28:10-21]

Two to three weeks later, Jackson was "doing a lot of things with [his] wrist and [his] right arm opening up boxes" at a different Konecranes worksite in London, Kentucky when

his "wrist stopped working." [*Id.* at p. 30:1-7] He called Konecranes employee Ryan Mead, who was directing the job in London, and informed him of the injury. [*Id.* at pp. 30:7-32:3] Mead advised him to seek medical treatment. [*Id.* at p. 32:4-10]

On February 27, 2019, Jackson submitted a first report of injury or illness to Liberty Mutual Insurance, Konecranes' workers' compensation insurance carrier. [Record No. 26-10] Liberty Mutual representatives communicated with Konecranes human resources ("HR") personnel regarding the plaintiff's claim. [*See* Record No. 26-10; Record No. 26-11, p. 20:11-23; Record No. 26-26.] Liberty Mutual did not communicate with Jackson's direct supervisor, Service Manager Tyler McKenzie, or Konecranes' Georgetown Branch Manager Ralph Hunley regarding the claim. [Record No. 26-6, p. 29:19-23; Record No. 26-11, p. 21:2-8; Record No. 26-12, pp. 25:3-8, 41:23-42:2] McKenzie specifically testified that he was not involved in any discussions regarding how much Jackson's worker's compensation claim cost the company or how much it would cost to settle the claim. [Record No. 26-6, pp. 146:15-147:5]

Jackson first saw medical providers at Concentra Medical Centers in Lexington, Kentucky who, on February 22, 2019, began to issue physical activity restrictions providing that the plaintiff: (1) may lift, push, and pull up to 20 pounds frequently, *i.e.*, up to 6 hours per day; (2) may grip, squeeze, or pinch with his right upper extremity occasionally, *i.e.*, up to three hours per day; and (3) must constantly wear a splint or brace on his right upper extremity. [Record No. 26-3, p. 66] Jackson returned to Concentra for follow-up medical examinations eleven times between February 25, 2019, and June 24, 2019. Each time, he received some activity restrictions. [*Id.* at pp. 67-76]

Konecranes accommodated the Concentra restrictions by assigning Jackson "light duty" work at the Georgetown branch's office, including desk work, light office cleaning, and "looking for parts." [*Id.* at pp. 33:25-36:8] In Jackson's words, "[a]s soon as I went to Concentra they told me they didn't want me doing anything until further notice . . . ." [*Id.* at p. 36:12-16] This light duty work continued until he began to see medical providers at Bluegrass Orthopaedics on July 8, 2019. [*Id.* at pp. 36:17-24, 78] The plaintiff received a pay raise during this roughly four-and-a-half-month period of light duty work on April 30, 2019. [Record No. 26-13, p. 4]

Dr. Ryan Donegan of Bluegrass Orthopaedics issued a doctor's form note after the July 8th appointment, indicating that Jackson could "[r]eturn to full duty w/ heavy lifting restrictions." [Record No. 26-14] The form note included various boxes to document specific functional ability limitations and restrictions, none of which were marked. [*Id.*]

Thus, the plaintiff returned to performing crane inspections in the field. [Record No. 26-3, p. 42:8-13] Jackson claimed during his deposition that he did not perform any "[h]eavy lifting over 40 pounds push/pull" for the remainder of his employment with Konecranes, but noted that Konecranes generally accommodated this limitation by either assigning him to jobs that did not require much heavy lifting or sending another employee to assist him when heavy lifting was required. [*Id.* at pp. 43:4-44:10] Additionally, the plaintiff remarked that crane inspections generally did not involve significant heavy lifting and that "it was pretty simple to ask someone on-site at the customer and they [were] usually able to accommodate" when necessary. [*Id.* at p. 43:4-8]

The 40-pound restriction is specifically reflected in October 15 and November 12, 2019, doctor's form notes from follow-up appointments with Dr. Juan Favetto of Bluegrass

Orthopaedics.   [Record No. 26-17; Record No. 26-19] During this same period, Donegan issued form notes on September 9 and November 4, 2019, which stated that Jackson could "[r]eturn to full duty w/ heavy lifting assistance."   [Record No. 26-16; Record No. 26-18] Donegan's form notes did not include a 40-pound restriction.

Nevertheless, Konecranes HR Generalist Megan McCallum (one of the employer's worker's compensation contacts with Liberty Mutual) emailed McKenzie on October 25, 2019, to ensure that he was aware of the 40-pound restriction.   [Record No. 26-20] McCallum followed up with McKenzie on November 14 to inquire about Jackson's work progress and whether the Georgetown branch had been able to assign him work.   [Record No. 26-21] McKenzie responded that "Allen [wa]s doing well" and  "ha[d] been doing his inspections since he was cleared in July."  [*Id.*]

### B. Jackson's Assignment to Novelis and Confusion Regarding His Physical Work Restrictions

Liberty Mutual asked that Jackson undergo an independent medical examination ("IME") with Dr. William Lester.  [Record No. 26-11, p. 11:19-24]  Lester performed the IME on January 20, 2020, during which the plaintiff expressly advised him that "he [wa]s currently working his regular full duty job."  [Record No. 26-25, pp. 3, 9-10]  Not surprisingly, Lester concluded there was "[n]o need for restrictions, the claimant is working full duty."  [Record No. 26-25, pp. 3, 9-10]  Lester also recommended that the plaintiff receive an MRI on his right elbow, as the plaintiff reported that it would "occasionally lock up" and cause him to experience sharp pains.  [*Id.* at pp. 3, 8-10]

In January or early February 2020, McKenzie approached Jackson about a position as a designated on-site employee at the Novelis facility in Berea.  [Record No. 26-3, pp.

33:19-34:13]   The plaintiff initially told McKenzie that he was not interested.   [*Id.* at p. 65:12-15]  During later conversations about the position, McKenzie and Hunley told him they believed he would be a "good fit for the job."  [*Id.* at p. 98:6-9]  The plaintiff reconsidered on the condition that he receive a pay raise.[1]  [*Id.* at pp. 48:8-10, 67:1-4]  McKenzie responded that "he'd see what he could do."  [*Id.* at p. 48:10]

Jackson was then assigned to work at the Novelis facility in late February 2020 as a "sort of . . . temporary designated Konecranes site person."  [*Id.* at p. 99:9-13.]  McKenzie and Hunley wanted Jackson "to be interested and accept the role" permanently if they could meet his demand.  [*Id.* at p. 98:10-15]  In other words, the plaintiff would temporarily fill the vacancy even if another Konecranes employee eventually assumed the permanent position. [*Id.* at p. 74:13-15]  Jackson acknowledged during his deposition that McKenzie told him that "he appreciated [Jackson] taking care of business."  [*Id.* at p. 74:15-16]

Hunley testified that he would not have been in favor of the temporary assignment if he knew that Jackson "had been on restrictions" because he "knew Novelis would not have wanted somebody who had restrictions working down there [at the Berea facility]."  [Record No. 28-2, pp. 43:7-11, 46:11-21] He explained that, based on "numerous years at Konecranes," including more than six years of field work at Novelis, he understood that "someone on certain restrictions could not have did [*sic*] the work at Novelis."  [*Id.* at p. 47:3-15]

After Jackson began the temporary assignment, he surreptitiously recorded a March 5, 2022, meeting with McKenzie and Hunley regarding his progress and the possibility of taking the permanent on-site position.  [Record No. 26-3, p. 62:15-21]  During this conversation, he

---

[1]  At the time, the plaintiff was making $23.72 per hour as a site-to-site crane inspector.  [*See* Record No. 26-13.]

requested a raise to $32.00 per hour but advised that he was willing to negotiate. [Record No. 26-23, March 5, 2022 Recording, 31:30-32:30] Hunley stated that he felt Konecranes District Manager Troy Post might approve around $28.00 per hour, to which the plaintiff responded that he would be willing to take the new position permanently for an hourly rate of $29.50. [*Id.* at 32:24-33:00, 36:38-36:52] Hunley explained that certain percentage raises require approval from various Konecranes employees in management positions but that he would work with the plaintiff to obtain an agreeable raise commensurate with the added responsibilities of the on-site position. [*Id.* at 36:52-37:50] The supervisors generally commended the plaintiff's work, and McKenzie stated, "[w]e're looking for a commitment, and we feel like you're going to fight for us. Therefore, we're going to fight for you." [*Id.* at 40:36-40:50]

On March 11, 2020, McKenzie emailed, *inter alia*, McCallum and Hunley advising them that Jackson would be getting an MRI on March 18, 2020, with a follow up appointment "with the doctor that placed him on restrictions originally" on April 13, 2020.[2] [Record No. 28-10] McCallum responded: "Please make sure he provides you with paperwork." [*Id.*] In the same email chain, McKenzie replied on March 19, 2020, that Jackson would not get the results (and thus, no paperwork) until the April 13, 2020, appointment. [*Id.*]

Novelis Procurement Leader Ted Rush called McKenzie on March 12, 2020, to advise him of concerns regarding the plaintiff's work restrictions. [*See* Record No. 26-6, pp. 45:18-46:23; Record No. 26-23, March 12, 2020 Audio Recording.] Rush advised that Jackson informed a Novelis employee that he had restrictions and had asked for help pulling and

---

[2]  The record indicates that "the doctor that placed [Jackson] on restrictions originally" is a reference to Donegan.

pushing based on those restrictions.  [Record No. 26-23, March 12, 2020 Audio Recording, 1:55-2:15, 5:00-5:20]

McKenzie and Hunley spoke with Jackson about Rush's concerns during a meeting that same day, which the plaintiff again secretly recorded.[3]  [*Id.*]  Rush's call confused the supervisors because they had received contrary information from McCallum, who advised that Jackson had been cleared to work with no restrictions two months earlier.  [*Id.* at 1:55-4:30] The plaintiff believed that he had the 40-pound restriction documented in Favetto's November 12, 2019, doctor's form note, as he had not yet received the results of Lester's IME from Liberty Mutual or Konecranes' HR department.  [*See id.* at 2:18-4:53.]

Hunley clarified that Konecranes did not want to "share any inaccurate information" with Rush "because it's going to make us sound . . . like we don't know what the hell is going on and we may be trying to hide something" from Novelis, *e.g.*, "that we stuck somebody on restriction down there, knowing they're on restriction."  [*Id.* at 10:28-10:46.]  However, he noted "that's not the case," because it seemed as though the plaintiff honestly believed he had restrictions due to the fact that he had not been told otherwise.  [*Id.* at 10:47-10:57] Ultimately, the supervisors concluded that the confusion resulted from a "lack of communication," and McKenzie voiced frustration that Liberty Mutual and Konecranes' HR department had not kept him (and Jackson) fully apprised of the situation.  [*Id.* at 10:58-11:27]

---

[3]  Jackson asserts in his brief that this conversation occurred on March 13, 2022.  [Record No. 28, p. 2]  But he has already admitted that the recording of the conversation was created on March 12, 2020, in his answer to an interrogatory.  [Record No. 31-2] Additionally, the defendant has produced a screen shot of metadata from the recording demonstrating that it was created on March 12, 2020, at 3:33 p.m.  [Record No. 31 pp. 3-4]

Hunley also advised Jackson during the March 12, 2020, meeting that he and McKenzie would be meeting with Post the following day and that they would be "going to bat" for the plaintiff regarding his request for a pay raise. [*Id.* at 25:06-22] McKenzie told Jackson he was "doing a good job" at Novelis. [*Id.* at 25:25-25:27]

After this meeting with Jackson, Hunley followed up with Rush and advised him of the situation. The branch manager agreed during his deposition that "Rush was completely satisfied and . . . Jackson continued covering for the site supervisor after that." [Record No. 26-12, p. 92:9-14]

It is not clear whether Hunley and McKenzie spoke with Post on March 13, 2020, but McKenzie prepared a document on March 16, 2020, to be sent to Post regarding the potential pay raise. That document listed all of Jackson's pay raises to date and also stated as follows:

> Allen has had numerous roles in his time in the company. He worked as a technician in HUN until he accepted a role change as the site supervisor for Steel West Virginia. Later on he moved locations from Huntington to Georgetown where he became a full time inspector on the road. Allen has received ample positive praise from our inside/outside sales forces for the quality inspections he turns over. Customers have reached out individually to request his services with the skill set he brings to the table on every inspection he provides. Allen's [*sic*] see's [*sic*] the site position at Novelis as a great opportunity to accept a larger role in our business. He is willing to do whatever it takes to provide our customer with a safe environment while also strengthening Konecranes['] relationship with the customer.

[Record No. 26-13, p. 4] Hunley sent this document to Post on March 17, 2020, noting, *inter alia*, that: (1) the plaintiff was "asking for 29.50 per hour without receiving drive time or overtime"; and (2) "[b]ased on the needs and expectation we have for the Novelis Site Technician, everything keeps leading us to back Allen Jackson. We do have 2 other Field Operatives somewhat interested in Novelis, but only for the wrong reasons, an increase in pay, nothing about growing the account." [*Id.*]

### C. Novelis' Complaint Regarding Jackson's On-Site Hours and the Plaintiff's Termination

Jackson was ordinarily paid for drive time in his company vehicle, and Konecranes has admitted that he was entitled to payment for his time traveling to and from Novelis during the temporary assignment. [*See*, *e.g.*, Record No. 26-3, p. 91:4-11; Record No. 26-5, ¶ 2.] However, McKenzie and Hunley only advised the plaintiff that he needed to work 40 hours per week during the assignment, rather than 40 hours per week *on-site* or 40 hours per week *including drive time*. [Record No. 26-3, p. 90:20-91:11] For these reasons, Jackson proceeded with the understanding that he was to work 40 hours total, including his drive time to and from Novelis, during his temporary assignment as the designated on-site Konecranes employee. [*Id.* at p. 197:17-24]

But Novelis had a different understanding. The contract between Konecranes and Novelis required the crane company to provide an employee on-site at the Berea facility "for 40 to 45 hours per week." [Record No. 26-27, p. 22:21-23] Novelis accordingly presumed that Jackson would work at least 40 hours per week on-site. Consistent with this understanding, the Novelis site contact advised the plaintiff that he needed to work 40 hours per week *on-site*, "as that's what the previous [permanent on-site Konecranes employee] was doing." [Record No. 26-3, p. 89:7-11] Jackson testified that he believed he "didn't have to follow the Novelis site contract because [he was not] the [permanent] designated site person yet" and was not subject to Konecranes' contract with Novelis. [*Id.* at pp. 90:24-91:14, 95:17-23]

Rush contacted Konecranes on March 30 or March 31, 2020, "complaining that Jackson had been arriving late, leaving early, and not working the required forty hours on-site each

week."  [Record No. 26-2, ¶ 8; Record No. 26-27, pp. 22:18-23; Record No. 28-2, p. 26:6-14]  Rush testified that he told Hunley he "wanted to credit . . . Novelis for the hours [Jackson had] not worked."  [Record No. 26-27, pp. 32:25-23:1]

McKenzie and Hunley investigated the matter.  Hunley obtained the Novelis guard shack check-in and check-out times reflecting when the plaintiff arrived and left the Berea facility for workdays between March 2 and March 19, 2020.  [Record No. 26-28, p. 7]

McKenzie obtained the plaintiff's Konecranes time records and company truck Geotab records.  Jackson, like other Konecranes employees, "enter[ed] a start and end time on [his] iPhone" every workday for the company's digital timekeeping system.  [Record No. 26-6, pp. 141:20-142:4]  Thus, the Konecranes time records maintained through this system reflect the times the plaintiff claimed to have started and finished work every day.  [*See id.* at pp. 141:24-142:21.]  Accounting for compensated drive time, the plaintiff was supposed to enter a start time corresponding to the time he left his home for work and an end time corresponding to the time he arrived at home "or where[ever] he [wa]s going after work."  [*Id.* at p. 142:9-21]

The plaintiff agreed during his deposition that he "accurately record[ed] [his] time for Konecranes that just included [his] drive time and [his] time at Novelis each day."[4]  [*See*

---

[4]  Jackson has tendered a July 27, 2022, affidavit in response to the motion for summary judgment, which asserts he "complet[ed] paperwork off-site" in his vehicle or home during his assignment at Novelis and claimed this as "compensable time" for the purposes of Konecranes' timekeeping.  [Record No. 28-19]  As the defendant argues, the deposition testimony described above directly contradicts this assertion.  [Record No. 31, p. 2]  Because the plaintiff plainly testified during his April 19, 2022 deposition that he claimed "just" drive time and time spent working at Novelis during the assignment, his later assertion that he claimed time working on paperwork off-site is entitled to no weight under the "sham affidavit" rule.  *See, e.g., Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832, 842 (6th Cir. 2021) ("Sham affidavit" rule "provides that a party cannot create a genuine dispute of material fact with an affidavit that conflicts with the party's earlier testimony about the fact.").

Record No. 26-3, p. 197:20-24; *see also id.* at p. 225:12-24.]  McKenzie similarly indicated that "[t]here's no work to do at home as a crane tech or inspector," such that Jackson's time reporting for Konecranes would only account for his time on-site and drive time.  [Record No. 26-6, p. 113:5-20]

The Geotab records include GPS-type data from Jackson's company truck and demonstrate, *inter alia*, the times the plaintiff left for work from his home in Lexington, Kentucky, and the times he arrived home (or a different location) following his commute from Berea after work.  [Record No. 26-22] The data from the plaintiff's company truck do not completely document his work-related travel during the relevant period because he used a spare vehicle between March 12, 2020, and March 30, 2020.  [*See* Record No. 26-22, p. 4; Record No. 26-28, p. 2.]  However, the available data provide a cohesive picture of the plaintiff's use of his company truck for all other relevant dates.

After reviewing this information, McKenzie determined as follows:

The records showed Jackson had been on-site at Novelis for only 34.25 hours the week of March 2nd, only 29 hours the week of March 9th and only 33.75 hours the week of March 16th.

The records also showed that Jackson arrived at Novelis at approximately 10:00 a.m. or later on multiple occasions during the three-week period from March 2-20, 2020, including March 2nd when he arrived at 11:40 a.m., March 9th when he arrived at 10:08 a.m., March 12th when he arrived at 9:37 a.m., March 17th when he arrived at 10:00 a.m., and March 19th when he arrived at 9:58 a.m.

The records also showed that Jackson failed to work on-site at Novelis for a significant portion of his regular eight-hour day on multiple occasions during this brief period, including March 2nd when he was on-site for only 3.5 hours, March 9th when he was onsite for only 6 hours, March 12th when he was on-site for only 4 hours, March 13th when he was on-site for only 5 hours, and March 17th and 19th when he was on-site for only 5.25 hours each of those days.

- 12 -

The records also showed that on April 6, 2020, Plaintiff did not arrive on-site at Novelis until 9:30 a.m. Novelis contacted Konecranes to see why Plaintiff was late, stating that Plaintiff had not notified anyone there.

In April 2, 2020, Konecranes' GPS records showed that Jackson left his home at 6:30 a.m., but his Konecranes time records reflect a start time of 6:00 a.m.

The GPS records also showed that on April 3, 2020, Jackson left his home at 7:57 a.m., but his Konecranes time records reflect a start time of 7:15 a.m.[5]

[Record No. 26-2, ¶¶ 11-16]

Jackson asserts that the relevant records for two other Georgetown branch crane inspectors, Nathan Nichols and Garey Olin, "reveal[] over twenty (20) instances where inspectors engaged in the same conduct as Mr. Jackson, but were not terminated." [Record No. 28, p. 22; Record No. 28-20] In other words, these employees claimed compensable time relating to off-site paperwork. [Record No. 28, p. 22] Konecranes has produced an affidavit from McKenzie stating that he never received customer complaints regarding Nichols and Olin, "never had any reason retrieve or examine the[ir] GPS records," and is currently "unaware of any irregularities in [their] timekeeping practices and unaware of any instances

---

[5] While the April 2 and April 3, 2020, Geotab and Konecranes time records do indicate that the plaintiff misrepresented his start time on those dates, the data provided in connection with the pending motion evidence time reporting discrepancies on several other occasions during the relevant period. For example, the Geotab records indicate that the plaintiff left his home at 6:37 a.m. on March 6, 2020, 9:19 a.m. on March 9, 2020, and 7:23 a.m. on March 11, 2020. [Record No. 26-22, p. 4] However, he entered the following start times on his iPhone for these respective dates: 6:15 a.m., 8:00 a.m., and 7:00 a.m. [Record No. 26-30, pp. 11-12] Additionally, the Geotab records indicate that the plaintiff finished his commute from Berea to Lexington at 4:10 p.m. on March 10, 2020, 5:06 p.m. on April 2, 2020, and 5:07 p.m. on April 3, 2020. [Record No. 26-22, pp. 4-5] Yet Jackson entered the following end times for those respective workdays: 4:30 p.m., 5:30 p.m., and 5:30 p.m. [Record No. 26-30, pp. 12, 15] Thus, even if one assumes that Jackson accurately reported his start and end times on all days for which Geotab data is not available, the evidence strongly suggests that he claimed more time for compensation purposes than he should have on at least eight occasions between March 6 and April 6, 2020.

when their GPS records show them at home while they were still 'on the clock' according to their Konecranes' time records." [Record No. 31-5, ¶¶ 6-7, 9-10]

McKenzie concluded that Jackson had not worked on-site at Novelis for 40 hours per week and had also falsified his Konecranes time records by claiming more time for compensation than he actually worked. [*Id.* at ¶ 17] After consulting with HR Manager Sandra Fleming, McKenzie advised Post and Tom Kurtz, another member of Konecranes management, of the investigation results, recommending that Jackson be terminated. [Record No. 26-6, pp. 70:14-71:8] Post and Kurtz agreed with that recommendation. [*Id.* at p. 71:9-10]

McKenzie, Hunley, and Fleming met with the plaintiff on April 8, 2020, to inform him that he had been terminated. [*See* Record No. 26-23, April 8, 2020 Audio Recording.] McKenzie issued a signed statement that same day, which provided as follows:

> Today April 8th 2020, Francis [Allen] Jackson's employment with Konecranes was terminated. Allen has been interested in filling the open site position at Novelis in Berea, KY. He has been on site there for the entirety of March. The customer called Konecranes management with concerns regarding the amount of time Allen was on site every day. They provided us with times every day Allen was clocking in and out at the guard shack. After investigating and confirming on Geo Tab[,] it was confirmed that Allen had falsified his time ticket on numerous days resulting in termination.

[Record No. 26-29, p. 5] The official Konecranes termination checklist form likewise indicated that the "Primary Reason for Termination" was a "Violation of Company Policy," specifically "falsifying time." [Record No. 26-31, p. 2]

Jackson attended his MRI follow up appointment with Donegan on April 13, 2020. [Record No. 28-12] Donegan issued a doctor's form note indicating that Jackson could "[r]eturn to work with restrictions," specifically "[n]o lifting >40#, [n]o repetitive lifting." [*Id.*]

McKenzie emailed Rush on April 13, 2020, to ensure that he had "everything 100% correct before letting [him] know the final number of hours [Jackson] had in the month of March" and requesting the plaintiff's Novelis guard shack times from March 23 through March 27, 2020.  [Record No. 26-32, p. 3]  After several subsequent emails, McKenzie followed up on April 28, 2020:

> I have gathered all the info I believe I should need to give you guys a new invoice amount for this month.  The new total of this month's invoice will be [redacted].  I will be decreasing [redacted] from the original amount . . . . I ended up taking 35 hours off of the price after looking at [Jackson's] guard shack times.

[*Id.* at p. 2.]

### D.  Procedural Background

Jackson filed this action on September 30, 2021.  [Record No. 1] He alleges that Konecranes retaliated against him for pursuing a worker's compensation claim when it fired him on April 8, 2020, in violation of the KWCA, KRS § 342.197(1).  The defendant has moved for summary judgment on the sole claim the plaintiff alleges.  [Record No. 26]

## II.  The Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there

is sufficient evidence from which the jury could render a verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

### III. Analysis

The KWCA provides that "[n]o employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful" workers' compensation claim. KRS § 342.197(1). Where a plaintiff lacks direct evidence of retaliatory conduct, he must show, *inter alia*, that: "(1) he engaged in a protected activity; (2) the defendant knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915-17 (Ky. Ct. App. 2006) (citing *Brooks v. Lexington–Fayette Urban County Housing Authority*, 132 S.W.3d 790 (Ky. 2004)).

It is undisputed that Jackson engaged in a protected activity in early 2019. The exact date of the protected activity is not entirely clear from the record, as the KWCA offers protection for employees' "pursuit" of a workers' compensation claim and pursuing benefits under the statute does not necessarily require that a formal claim be filed. *See*, *e.g.*, *Overnite Transp. Co. v. Gaddis*, 793 S.W.2d 129, 132 (Ky. Ct. App. 1990). Regardless, Jackson

- 16 -

engaged in a protected activity no later than February 27, 2019, the date he submitted the first report of injury or illness to Liberty Mutual.

Jackson contends that the statute's protection for "pursuit" of a workers' compensation claim also renders subsequent "doctor's visits, continuing work restrictions, the February 2020 'independent' medical examination ordered by Defendant's workers' compensation insurer, and his March 18, 2020, MRI . . . legally protected activit[ies]." [Record No. 28, p. 14] In other words, he essentially argues that every action relating to his workplace injury following the formal filing of his claim constitutes "pursuit" of the claim and a separate protected activity.

Jackson offers no case authority in support of this position. *Overnite* is the only case he cites regarding "pursuit" of a claim under KRS § 342.197(1) and, as noted above, that case stands for the proposition that an employee need not file a formal claim for workers' compensation benefits to receive protection under the statute. Specifically, the court found that the statute "has the effect of placing employees who have filed *or* are pursuing a lawful claim for workers' compensation benefits within the protective ambit of the anti-retaliation provision." 793 S.W.2d at 132 (emphasis in original). Because he gave "notice of his injury [to his employer] and received temporary disability benefits pursuant to KRS 342.040," the plaintiff in *Overnite* could proceed under KRS § 342.197(1) even though he had not filed a formal workers' compensation claim. *Id.* at 130, 132.

*Overnite* does not address whether actions taken after the filing of a formal claim may constitute separate protected activities for the purpose of the present analysis. At any rate, this issue only matters for consideration of whether there is a causal connection between a protected activity and the adverse employment action, *i.e.*, Jackson's discharge.

- 17 -

"The plaintiff is not required to demonstrate that the sole or even the primary reason for the termination was related to the protected activity but only that its pursuit was a 'substantial and motivating factor' in the decision to terminate." *Dollar Gen. Partners*, 214 S.W.3d at 915 (quoting *First Property Mgmt. Corp. v. Zarebidaki*, 867 S.W.2d 185 (Ky. 1993)). "[A] close temporal relationship between the protected activity and the adverse action" is usually required but also "generally insufficient to sustain a retaliation claim where . . . the plaintiff does not point to any other facts or circumstances which would support an inference that the employer retaliated against the plaintiff based on the workers' compensation claim." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 453-54 (6th Cir. 2017) (cleaned up). "Close temporal proximity does not mean that the employee must be terminated within days or even weeks of the filing of a workers' compensation claim," and courts must "view the time between the two events in the context of the entire circumstances." *Dollar Gen. Partners*, 214 S.W.3d at 916 (internal quotation marks omitted).

Jackson argues that the March 12, 2020, recorded conversation regarding his physical work restrictions, his March 18, 2020, MRI, and the March 11-19, 2020, emails regarding the follow up appointment with Donegan "are evidence of Mr. Jackson's pursuit of workers' compensation benefits" that occurred within a month of his termination, establishing temporal proximity.  [Record No. 28, pp. 15-16] But as stated, the Court must consider all of the circumstances regarding temporal proximity, which necessarily includes, as Konecranes argues [Record No. 26-1, p. 17], circumstances predating these events.

Thirteen to fourteen months elapsed between the plaintiff's actions initiating the claim and his termination.  Jackson testified that Konecranes accommodated his physical work restrictions as soon as Concentra providers imposed them in February 2019, assigning him to

"light duty" work for over four months until July 2019.  He also received a pay raise during this period.

Hunley and McKenzie were not involved with the workers' compensation claim process and appear to have received information relating only to physical work restrictions from Konecranes' HR department, which was communicating with Liberty Mutual.  They accommodated all restrictions until, at least, late February 2020 when Jackson was designated as the temporary on-site representative at Novelis.  Even if one assumes that the events of March 2020 are relevant for the purposes of assessing temporal proximity, the totality of the circumstances do not give rise to an inference of a causal connection given the extensive period during which it is undisputed that Konecranes took no objectionable action following the filing of the claim.  *See Chavez v. Dakkota Integrated Sys., LLC*, 832 F. Supp. 2d 786, 801 (W.D. Ky. 2011) ("The temporal proximity between the claims and the adverse action does not give rise to an inference of causal connection, as the workers' compensation claims occurred twelve and nineteen months, respectively, before Plaintiff was laid off.").

Additionally, the defendant is correct that Jackson's other causation arguments do not support an inference of workers' compensation retaliation for the purposes of KRS § 342.197(1).  [Record No. 31, pp. 12-15] Even if one overlooks the reasons the defendant provided for the termination, the evidence, at best, supports an inference that Konecranes fired Jackson based on: (1) physical work restrictions relating to his workplace injury; and/or (2) a fear that retaining Jackson would upset Novelis, its longtime valued customer.  Neither inference is sufficient to sustain a KWCA claim for workers' compensation retaliation.

Consider Jackson's "most important" causation argument that is not related to temporal proximity.  [Record No. 28, p. 16] Jackson contends that Hunley's reservations about

designating an employee with restrictions for the Novelis position evidence retaliation.  [*Id.*] But as Konecranes argues [Record No. 31, pp. 13-14], Hunley's deposition testimony clarifies that he held these views because he did not think someone with physical work restrictions could do the work Novelis required.

"In cases where an employer terminates an employee due to the employee's inability to do the job, the case law has established that the employer is not liable under Kentucky's Worker's Compensation statute."  *Gibson v. Solideal USA, Inc.*, No. 3:09–CV–559–H, 2011 WL 63612, at *2 (W.D. Ky. Jan. 7, 2011) (collecting cases).  This is true even when the employee's work-related injury results in physical restrictions that preclude him from performing the job.  *See id.* at *1-2; *Henderson v. Ardco., Inc.*, 247 F.3d 645, 647-48, 654 (6th Cir. 2001); *Daniels v. R.E. Michel Co.*, 941 F. Supp. 629, 632 (E.D. Ky. 1996).

In other words, "[t]he pursuit of [a workers' compensation] claim, as opposed to the condition of the employee, must be a 'substantial motivating factor . . .' in the chain of causation."  *Daniels*, 941 F. Supp. at 632.  This distinction may be subtle, but it furthers the KWCA retaliation provision's legislative purpose "to protect persons who [are] entitled to benefits under the workers' compensation laws and to prevent them from being discharged for taking steps to collect such benefits."  *Id.* (quoting *Overnite*, 793 S.W.2d at 132).  Thus, Jackson's claim cannot succeed based on a theory that Konecranes fired him for physical work restrictions that limited (or might limit) his ability to perform the tasks he was assigned.[6]

---

[6]  This point also underscores a significant weakness in the plaintiff's argument that medical appointments relating to his workplace injury should count as independent protected activities under the KWCA.  Jackson needed medical attention regardless of whether he was pursuing a workers' compensation claim.  The case law indicates that the existence of a workplace injury and corresponding physical limitations are distinguishable from the pursuit of a claim for workers' compensation benefits relating to that injury for the purposes of causation.  It is

Ignoring this problem with his causation theory, Jackson proceeds to assert that: (1) "it is reasonable to infer that the Defendant knew it was all but certain that Dr. Donegan would place [him] on restrictions at his April 13, 2020, follow up" appointment; and (2) Konecranes made the decision to fire the plaintiff in retaliation for seeking this medical care after McKenzie and Hunley recommended him for a pay raise on March 17, 2020. [Record No. 28, pp. 16-18]  In support, the plaintiff asserts that "on March 19, 2020, the day after [his] MRI, McKenzie emailed Hunley to inform him that the results of [his] MRI would be determined at an April 13, 2020, follow-up appointment with Dr. Donegan at BGO, the same doctor that placed [him] on restrictions in November 2019." [*Id.* at p. 17.]

But the plaintiff misconstrues the relevant timeline.  McKenzie emailed Hunley and McCallum on *March 11, 2020*, noting Jackson's March 18 MRI and the April 13 follow up appointment "with the doctor that placed him on restrictions originally."  The March 19 email merely affirmed that the MRI results would, in fact, be discussed during the April 13 appointment.  Thus, McKenzie and Hunley both knew Jackson would be seeing "the doctor that placed him on restrictions originally" *before* the March 12, 2020, recorded conversation, during which they discussed the fact that they would be "going to bat" for him.  And they knew Jackson would be returning to Donegan before they did, in fact, vigorously vouch for the pay raise on March 17, 2020.  KRS § 342.197(1) does not prohibit termination based on a fear that a doctor might impose future physical work restrictions.  But even if it did, the evidence in this case does not support the argument the plaintiff advances.

---

unclear why seeking medical attention for a workplace injury would not also be separable from the pursuit of a workers' compensation claim for the purposes of establishing a protected activity.

Moreover, KRS § 342.197(1) does not preclude an employer from terminating an employee to appease a customer. *See Bush*, 683 F. App'x at 454.  That Hunley and McKenzie may have been concerned about how Novelis would perceive the fact that they had designated an employee who had restrictions (or believed that he had restrictions) without telling the customer about this issue is not evidence that they retaliated against him for pursuing his workers' compensation claim.  At best, it is evidence that they were willing to do what was necessary to satisfy their customer, even if that meant taking action at Jackson's expense.

Regardless, the plaintiff offers no evidence to refute Hunley's testimony that Rush was "completely satisfied" with the restrictions situation when he spoke with the Novelis representative following the March 12, 2020, conversation.  Jackson proceeded to work at Novelis for several additional weeks, and it does not appear that the customer ever raised the restrictions issue again.

Additionally, it is undisputed that: (1) the plaintiff did not work 40 hours per week at Novelis; and (2) Rush voiced his concerns about the plaintiff's hours on-site, asking that the customer be credited for the hours Jackson did not work.  McKenzie's emails to Rush following Jackson's termination demonstrate that he did, in fact, credit Novelis as requested. The plaintiff goes to considerable lengths to attempt to discredit McKenzie's investigatory

findings.[7]  [Record No. 28, pp. 19-20]  But even if these findings were not entirely accurate, the evidence would suggest that the customer's dissatisfaction with the plaintiff's on-site work led to his termination.  This is true regardless of whether Jackson was justified in believing that he was not subject to the contractual 40-hour per week on-site work requirement during his temporary assignment at Novelis.

That said, McKenzie's April 8, 2020, statement and the Konecranes termination checklist form indicate that the primary reason the employer provided for Jackson's termination was a breach of company policy, *i.e.*, falsification of time records.  And the record indicates that Jackson actually falsified time records.  The plaintiff's deposition testimony establishes that he did not engage in a practice of claiming compensable time for completing paperwork off-site.  The time records for April 2 and April 3, 2020 (as well as other dates) indicate that he was claiming more than drive time and hours on-site when viewed in light of the Geotab data.

---

[7] One of the arguments on this point borders on a lack of candor.  Jackson's counsel claim that McKenzie incorrectly determined that Jackson arrived late to work at 9:30 a.m. on April 6, 2020.  [Record No. 28, p. 20]  In support, counsel cite a single page of Geotab data showing that Jackson arrived an hour earlier at 8:27 a.m. without reference to any time zone.  [Record No. 28-20]  The defendant has tendered the full relevant Geotab record, and the first page of that document states that the time zone is "CST6CDT," *i.e.*, Central Standard Time.  [Record No. 31-3, p. 2]  8:27 a.m. in the Central Time Zone is 9:27 a.m. in the Eastern Time Zone, where all parties should reasonably know the Novelis facility in Berea is located.  Moreover, the defendant had earlier filed the relevant Eastern Standard Time Geotab record, which shows that Jackson's truck arrived at Novelis at 9:27 a.m.  [Record No. 26-22, p. 5]  Plaintiff's counsel's selective reliance on unlabeled Central Standard Time data could reasonably be construed as a deliberate attempt to mislead the Court.

Thus, the evidence indicates that the falsification of time records was a significant cause of his termination.[8]  And summary judgment is appropriate on causation grounds where an employee was terminated for breaching company policy.  *See Bush*, 683 F. App'x at 454; *Wells v. Huish Detergents, Inc.*, 19 F. App'x 168, 178 (6th Cir. 2001); *Daniels*, 941 F. Supp. at 632.

Finally, there is no evidence that McKenzie, Hunley, or any other Konecranes personnel considered or even discussed the plaintiff's workers' compensation claim (or restrictions) during the investigation that resulted in his termination.  This further suggests that the claim was not a cause of the adverse employment action.  *See Chavez*, 832 F. Supp. 2d at 801 (summary judgment was appropriate where, *inter alia*, there was not "any evidence that these [workers' compensation] claims were considered by Defendants when they chose to lay off Plaintiff.").

A plaintiff's "ultimate burden" under the KWCA is to establish that his workers' compensation claim was "'a substantial and motivating factor but for which [he] would not have been discharged."  *Witham v. Intown Suites Louisville Northeast, LLC*, 815 F.3d 260, 263 (6th Cir. 2013) (quoting *First Prop. Mgmt. Corp.*, 867 S.W.2d at 188)).  All of Jackson's causation arguments suffer from factual and legal deficiencies, and the evidence generally indicates that his workers' compensation claim was not a cause -- let alone a substantial and motivating cause -- of his termination.

---

[8]  Even if Jackson claimed time for off-site paperwork, the defendant has offered evidence that McKenzie was and remains unaware of similar time claiming discrepancies for Nichols and Olin.  And the plaintiff points to no evidence that any supervisor was aware that crane inspectors would claim compensable time for off-site paperwork.  He merely speculates that Hunley may have known about this alleged practice based on his lengthy tenure and experience at Konecranes.  [Record No. 28, p. 23]

## IV. Conclusion

The Court cannot lose sight of what KRS § 342.197(1) addresses and what it does not. It prohibits employers from retaliating against employees for pursuing workers' compensation claims. It does not prevent employers from terminating employees for reasons the law deems distinct from pursuit of the claims themselves, even if one might consider those reasons imprudent or worse. *See Henderson*, 247 F.3d at 649, 654 (affirming summary judgment on a KWCA retaliation claim where the employer terminated the employee for not being "100% healed," a company policy the district court considered "insensitive and repugnant").

As described above, there is evidence to support Jackson's termination based on the falsification of time records. But even if that were not the case, the only reasonable inferences regarding Konecranes' motivations are those which involve reasons that are not unlawful under the KWCA. Additionally, the evidence relating to temporal proximity does not support an inference of causation. Because the plaintiff has not offered evidence that his pursuit of the workers' compensation claim motivated his termination, Konecranes is entitled to summary judgment.

Accordingly, it is hereby

**ORDERED** as follows:

1.      Defendant Konecranes, Inc.'s motion for summary judgment [Record No. 26] is **GRANTED.**

2.      Plaintiff Allen Jackson's KWCA workers' compensation retaliation claim is **DISMISSED** with prejudice.

Dated:  August 15, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky